# IN THE COURT OF APPEALS OF IOWA

No. 18-0492
Filed February 6, 2019

**STATE OF IOWA,**
　　Plaintiff-Appellee,

**vs.**

**CARLOS SIERRA-ROJAS,**
　　Defendant-Appellant.

_____

　　Appeal from the Iowa District Court for Warren County, Kevin A. Parker, District Associate Judge.

　　Carlos Sierra-Rojas appeals from his conviction and sentence for harboring a runaway. **AFFIRMED.**

　　Seth Harrington of Harrington Law LC, Urbandale, for appellant.

　　Thomas J. Miller, Attorney General, and Kevin Cmelik, Assistant Attorney General, for appellee.

　　Considered by Potterfield, P.J., Mahan, S.J.,* and Danilson, S.J.*

　　*Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2019).

**DANILSON, Senior Judge.**

Carlos Sierra-Rojas[1] appeals from his conviction and sentence, following a jury trial, for harboring a runaway, in violation of Iowa Code section 710.8(3) (2017). Rojas contends the district court erred in denying his pretrial motion to dismiss for improper venue; erred in denying his motion for directed verdict based on insufficient evidence; abused its discretion in admitting an untimely disclosed, irrelevant, and unfairly prejudicial exhibit; and erred in not instructing the jury that he did not have an affirmative duty to report the runaway's whereabouts to law enforcement.

Because venue is nonjurisdictional, Rojas's failure to file a pretrial motion for change of venue was not preserved. Because there was sufficient evidence Rojas committed the crime of harboring a runaway, the complained-of exhibit was disclosed as early as practicable and was not irrelevant and cumulative, and we determine he was not prejudiced by the court's refusal to give his proposed jury instruction, we affirm.

**I. Background Facts and Proceedings.**

The following facts were presented to the jury. On or about February 15, 2017, fifteen-year-old R.C. left her mother's home in Madison County, Iowa, without first obtaining her mother's permission. R.C. left a note, telling her mother the family was better off without having R.C. there and that R.C. would eventually return—R.C. testified the note may have said "a few days." An adult male named

---

[1] The defendant in his appellate brief uses the surname Rojas, as will we.

Tom[2] and a female named Lexi picked R.C. up from her mother's home and drove her to Des Moines, which is in Polk County, to Kathy and Jacob's house. When R.C.'s mother realized her daughter was gone, she called the Madison County Sheriff for help. R.C.'s mother reported R.C. was a runaway.

On the night of February 15, R.C. stayed at Jacob's house. The next day, Kathy drove R.C. to her mother's house so R.C. could get a backpack containing money and other items. Kathy drove R.C. back to Des Moines, and they stopped at an apartment. Around noon, R.C. went with Tom and another adult, David, to a fast-food restaurant. R.C., Tom, and David sat together at the restaurant, and Rojas was sitting diagonally from them.

Rojas looked over at the table several times and smiled. R.C. characterized Rojas as "staring" at her. David made a comment to R.C. about Rojas, and R.C. went over to the table to say hello. R.C. introduced herself and told Rojas she was nineteen years old. Rojas told R.C. he was twenty years old. R.C. eventually left the restaurant with Rojas and David and went to a nearby retail store. R.C. and David then got into an argument, and David left. R.C. and Rojas returned to the fast-food restaurant, then later R.C. and Rojas went to Rojas's house, which was nearby. Rojas lived with his father.

From Rojas's house, the two of them took a bus to the mall. R.C. paid both fares. After walking around the mall, R.C. and Rojas returned to Rojas's house via

---

[2] R.C. testified that Tom was eighteen years old at the time. R.C. knew many of the individuals with whom she interacted only by their first names. We will refer to these peripheral persons by first name only.

the bus—R.C. again paying the fares. The rest of the evening, R.C. and Rojas watched television together and then slept in the same bed.

The morning of February 17, R.C. and Rojas went to the fast-food restaurant to get food and use the restaurant's wireless internet. R.C. paid for both of their food. After an hour or two, they returned to Rojas's house and watched television the rest of the day. R.C. and Rojas again spent the night in the same bed.

On February 18, R.C. and Rojas watched more television. They again went to the nearby fast-food restaurant. R.C. again paid for food for both of them. While they were at the restaurant, R.C. used Rojas's phone to login to her Facebook account. A friend of R.C.'s mother had messaged R.C., telling her R.C. was on the news. R.C. then did an internet search of herself and found a news article. The article showed a photo of R.C., established she was fifteen years old, and explained she had run away from home on February 15. R.C. showed the article to Rojas, and the two of them discussed its contents. R.C. and Rojas left the restaurant and returned to Rojas's house. They watched more television, and R.C. spent the night. R.C. and Rojas had sex that night.

On February 19, R.C. used Rojas's phone to message E.L.[3] R.C. testified she contacted E.L. to see if they could meet at the mall and go to a movie. E.L. contacted R.C.'s mother and informed her R.C. had messaged him. R.C.'s mother testified she asked E.L. if he could get R.C. to meet up with him, and he said he could.

---

[3] R.C. considers E.L. her stepbrother. E.L. is the son of R.C.'s mother's former boyfriend.

R.C. and Rojas took the bus to the mall—R.C. paid the fares—and met E.L. there. R.C.'s mother testified E.L. told her R.C. "was getting spooked" being at the mall, and the plan to see a movie there was abandoned. E.L. then told R.C. he was going to take them to a movie in Indianola. R.C. and Rojas got into E.L.'s car, and E.L. drove them to a park in Indianola, which is in Warren County.

After she knew R.C. was in Indianola with E.L., R.C.'s mother contacted the police and went to Indianola with her two other daughters and E.L.'s father. R.C. testified she knew she was meeting up with her mom after E.L. took her to the park. Two police officers, Kyle Peterson and Brian Stern, arrived in separate cars around the same time R.C.'s mother arrived. Both officers testified at trial.

Officer Peterson first spoke with R.C.'s mother and confirmed R.C. was a runaway. Officer Peterson then approached E.L.'s vehicle and spoke with R.C. R.C. told Officer Peterson about her activities between February 15 and February 19. Officer Peterson learned R.C. and Rojas had sex. After speaking with R.C., Officer Peterson spoke with Rojas. He testified Rojas told him Rojas was "helping [R.C.] out" and knew she was a runaway. Rojas confirmed to Officer Peterson that Rojas and R.C. had sex.

Officer Stern initially spoke with R.C. and was eventually able to confirm her identity. Officer Stern then spoke to Rojas outside the vehicle and learned Rojas was aware R.C. was a runaway. Stern testified Rojas "said that he was trying to— he thought she was trying to leave the state, so he was trying to help her with that, to get her out of the state."[4] Officer Stern testified Rojas told him Rojas did not

---

[4] R.C. later testified she never told Rojas she wanted to leave the state, nor did Rojas ask her to leave the state.

know R.C. was fifteen years old. He did not remember whether Rojas told him R.C. had been staying with Rojas, but Officer Stern "got the impression, just from the conversation with him, that they had been together at least for a little while."

The officers conferred with one another, and Officer Peterson arranged for Rojas to go with R.C. and her family back to Rojas's house to retrieve R.C.'s personal belongings. Later, charges were filed against Rojas for harboring a runaway, and he was arrested.

According to the trial information, the State accused Rojas of harboring a runaway child, in violation of Iowa Code section 710.8(2). However, the charging language mirrors that found in Iowa Code section 710.8(3) rather than 710.8(2):

> The said Carlos Carmelo Sierra-Rojas, on or about February 19, 2017, in the County of Warren, and State of Iowa, did harbor R.C., a runaway child, with the intent of allowing the runaway child to remain away from home against the wishes of the child's parent, guardian, or custodian.[5]

Rojas filed a pretrial motion to dismiss, arguing venue was not proper in Warren County because if any offense occurred it happened outside Warren County. The court denied the motion.[6] The case proceeded to trial.

During trial, the State offered as an exhibit a screenshot of what appeared to be a text message between Rojas and R.C., sent at 7:56 p.m. the day before trial. Rojas's text to R.C. states:

---

[5] Paragraph "3" states, "A person shall not harbor a runaway child with the intent of allowing the runaway child to remain away from home against the wishes of the child's parent . . . ."

At trial, the State did not argue Rojas was guilty under 710.8(2), which provides, "A person shall not harbor a runaway child with the intent of committing a criminal act involving the child or with the intent of enticing or forcing the runaway child to commit a criminal act."

[6] Rojas again raised this issue in a motion for directed verdict, which was also denied.

So If you do all you would have to say is that we didn't have sex if they bring it up. There's a 50 50 chance they will but THE MAJOR PART IS TO SAY IF THEY ASK IF WE HAD SEX IS NO. NO MATTER WHAT WAS SAID. I ALREADY AM GOING TO SAY NO. YOU AND ME SAY NO AND WE'RE GOOD.

Rojas objected to the exhibit on the grounds that the evidence was not disclosed until the morning of trial and was irrelevant and prejudicial. The court admitted the exhibit, finding it was relevant to the question of Rojas's intent and excusing the timeliness of disclosure based on the fact the message had been sent the day before trial. At the close of the State's case-in-chief, Rojas moved for a directed verdict based on improper venue and insufficient evidence of Rojas's intent. The court denied the motion.

Rojas rested without presenting any additional evidence. Citing *State v. Freemont*, No. 03-0139, 2004 WL 2168424, at *2 (Iowa Ct. App. Sept. 29, 2004), Rojas proposed a jury instruction which stated, "The Defendant did not have an affirmative duty to report R.C.'s whereabouts to the authorities." The court summarily ruled it would not include the proposed instruction. The jury found Rojas guilty.

Prior to sentencing, Rojas filed a motion for a new trial based, in part, on the admission of State's Exhibit 2, the screenshot. That motion was denied. Rojas was sentenced to two years' incarceration, which was suspended, ordered to pay a fine, and was placed on probation. Rojas appeals.

**II. Scope and Standards of Review.**

We review a district court's ruling on a motion to dismiss for errors at law. *State v. Finders*, 743 N.W.2d 546, 548 (Iowa 2008). When reviewing a ruling on

a motion to dismiss, we accept as true the facts alleged by the State in the trial information and minutes of testimony. *Id.*

Issues of statutory interpretation are reviewed for correction of errors at law. *See State v. Olsen*, 848 N.W.2d 363, 366 (Iowa 2014).

We review challenges to the sufficiency of the evidence for correction of errors at law. *State v. Huser*, 894 N.W.2d 472, 490 (Iowa 2017). We will uphold a verdict if substantial evidence supports it. *See State v. Webb*, 648 N.W.2d 72, 75 (Iowa 2002). Evidence is substantial if it would convince a rational fact finder that the defendant is guilty beyond a reasonable doubt. *Id.* at 75–76. We consider the evidence in the record "in the light most favorable to the State, including all reasonable inferences that may be fairly drawn from the evidence." *Id.* at 76. We will consider all evidence in the record, including evidence that does not support the verdict. *State v. Petithory*, 702 N.W.2d 854, 856–57 (Iowa 2005). Evidence raising only "suspicion, speculation, or conjecture is not substantial." *State v. Leckington*, 713 N.W.2d 218, 221 (Iowa 2006).

We review the court's evidentiary rulings for an abuse of discretion. *State v. Neiderbach*, 837 N.W.2d 180, 190 (Iowa 2013). "A court abuses its discretion when its 'discretion was exercised on grounds or for reasons clearly untenable or to an extent clearly unreasonable.'" *State v. Long*, 814 N.W.2d 572, 576 (Iowa 2012) (citation omitted). "Even if an abuse of discretion is found, reversal is not required unless prejudice is shown." *State v. Jordan*, 779 N.W.2d 751, 756 (Iowa 2010) (citation omitted).

We review refusals to give a requested jury instruction for correction of errors at law. *Alcala v. Marriott Intern., Inc.*, 880 N.W.2d 699, 707 (Iowa 2016).

"As long as a requested instruction correctly states the law, has application to the case, and is not stated elsewhere in the instructions, the court must give the requested instruction." State v. Martinez, 679 N.W.2d 620, 623 (Iowa 2004) (quoting State v. Kellogg, 542 N.W.2d 514, 516 (Iowa 1996)). However, "[e]rror in giving or refusing jury instructions does not merit reversal unless it results in prejudice to the defendant." Kellogg, 542 N.W.2d at 516.

## III. Discussion.

*A. Venue.*

Rojas contends the court should have granted his motion to dismiss because venue was not proper in Warren County. The State responded that dismissal was "not the proper avenue." The State argued, "If anything, it is a transfer to Polk County where, in defendant's filings, he said this occurred." The State observed that if the defendant wanted a transfer to Polk County to be tried there, "the State is more than willing to have it transferred." The court ruled the issue "is not a matter for a motion to dismiss" but rather a "matter on a motion for change of venue," which "[a]t this point in time, that's not been filed."

"All objections to venue are waived by a defendant unless the defendant objects thereto and secures a ruling by the trial court on a pretrial motion for change of venue." Iowa Code § 803.2(3). In State v. Donnelly, 242 N.W.2d 295 (Iowa 1976), our supreme court examined the history and effect of changes to Iowa Code section 753.2 (now codified at section 803.2). Our supreme court concluded the legislature intended to make a substantive change from the previous venue provision, under which venue was explicitly a jurisdictional fact the State had to prove. See Donnelly, 242 N.W.2d at 297; see also State v. Allen, 293 N.W.2d 16,

20 (Iowa 1980) (noting previously "venue must be proved beyond a reasonable doubt" but was "no longer considered jurisdictional"). Because of the legislative change, venue is no longer "an essential element of the crime itself," nor "is it so vital that objections regarding it cannot be waived." *Allen*, 293 N.W.2d at 20.

Here, Rojas did not file a pretrial motion for change of venue but argued that venue was jurisdictional. The law is otherwise.[7] We find no error. *See* Iowa Code § 803.2(3); *Allen*, 293 N.W.2d at 20.

*B. Sufficiency of the Evidence.*

Rojas also contends there was insufficient evidence he provided aid, support, or shelter to R.C., or that he intended to allow R.C. to remain away from home against the wishes of her parent. The State contends error is not preserved on the intent argument.

We first address the State's error-preservation argument. For an issue to be properly preserved, it "must ordinarily be both raised and decided by the district court." *Meier v. Senecaut*, 641 N.W.2d 532, 537 (Iowa 2002). "When a district court fails to rule on an issue properly raised by a party, the party who raised the

---

[7] In *State v. Liggins*, our supreme court wrote:

> We believe state territorial jurisdiction is an essential element of the crime. As such the issue is properly submitted at trial. Only if the jurisdictional facts are undisputed should the court determine the issue by pretrial order. The State is required to prove territorial jurisdiction beyond a reasonable doubt.
>
> . . . .
>
> In contrast, venue in Iowa is now a nonjurisdictional issue. Venue deals with convenience and location of the trial rather than the power of the court to decide an issue on its merits. A defendant must secure a ruling by the trial court before trial or the venue issue is waived.

524 N.W.2d 181, 184–85 (Iowa 1994) (citations omitted).

issue must file a motion requesting a ruling in order to preserve error for appeal."

*Id.*

Rojas raised the sufficiency of the evidence of his intent in a motion for a directed verdict:

> Secondly, there has not been sufficient evidence presented on which a reasonable jury could find that Mr. Sierra-Rojas commited this crime beyond a reasonable doubt.
> . . . .
> More importantly, there is no way that a reasonable jury could find that Mr. Sierra-Rojas had the requisite intent for this crime, that he intended to give her help to allow her to remain away from home.

The State responded:

> The defendant intended to allow [R.C.], a runaway child, to remain away from home against the wishes of her parent. Clearly, he knew that she was a runaway on February 18, when he saw the news article with [her]. He knew she was 15. He knew she was a runaway. He . . . knew her mom had reported her as a runaway. He didn't do anything. He allowed her to stay another night at his place.
> . . . .
> The State has presented sufficient evidence for this factfinder to find the defendant guilty of these offenses—of this offense based on these elements.

The court ruled:

> The court notes that in the light most favorable to the State, the court makes the following findings. And that's on a motion for directed verdict, the State has to prove this matter. But, also, there has been no other evidence presented except the State's case-in-chief.
> . . . .
> Further, that there is sufficient evidence to show that she was a child under the age of [eighteen] and that Mr. Rojas did provide some shelter or aid to [R.C.]. So the court denies the defendant's motion for directed verdict.

We conclude Rojas preserved error regarding sufficiency of the evidence of his intent. *See Lamasters v. State*, 821 N.W.2d 856, 864 (Iowa 2012) ("If the court's ruling indicates that the court *considered* the issue and necessarily ruled

on it, even if the court's reasoning is 'incomplete or sparse,' the issue has been preserved." (citation omitted)).  Rojas raised the issue, and the State responded to Rojas's arguments.  Although the court specifically referenced only the sufficiency of the evidence that R.C. was a child under the age of eighteen and that Rojas provided her shelter or aid, the court necessarily ruled there was sufficient evidence on the issue of intent when it denied the motion.[8]

In support of his argument that there is insufficient evidence, Rojas directs us to two unpublished cases: *Freemont*, 2004 WL 2168424, at *1, and *State v. Reese*, No. 15–2200, 2016 WL 6270143, at *1 (Iowa Ct. App. Oct. 26, 2016).

In *Freemont*, the defendant was convicted of harboring a runaway under Iowa Code section 710.8(3),[9] sexual abuse in the third degree, and providing alcohol to an underage person.  2004 WL 2168424, at *1.  Freemont appealed the conviction of harboring a runaway, contending there was insufficient evidence to support that conviction.  *Id.*  The runaway stayed at the same house as Freemont, which was also occupied by Freemont's mother, Freemont's brother, and several other people—a total of thirteen.  *Id.*  The runaway testified everyone in the house, including Freemont, knew she was a runaway.  *Id.*  The runaway received food and shelter at the house, and while the runaway stayed there, Freemont slept on the couch at night.  *Id.*  On the third and fourth nights, Freemont brought alcohol

---

[8] We further note the court expressly acknowledged earlier during trial, in ruling on the admissibility of State's Exhibit 2, "the State is required to prove that the defendant assisted or intended to allow [R.C.] to remain away from her parent or parents and knew that she was a runaway. . . .  They also have to prove the defendant's intent.  This is a specific intent crime."  The court was fully aware of the State's burden to prove all the elements of the crime.

[9] This statute was last amended in 1996 and is thus identical as applied to *Freemont*, *Reese*, and the present case.

to the runaway and had sex with her. *Id.* Freemont was subsequently arrested and charged. *Id.*

The State argued Freemont was obligated to report the runaway to authorities, and when he failed to do so and gave her alcohol, he facilitated and encouraged her to remain away. *Id.* at \*2. Our court observed that Iowa Code section 710.8 makes no reference to reporting runaways to authorities. *Id.* Our court also observed, "[T]he evidence is clear that defendant had no ownership of the house nor control over the actions of others in the house where he stayed. He was merely a guest at the house, which the defendant argued at trial." *Id.* Our court concluded there was insufficient evidence the defendant provided aid, shelter, or support, or otherwise assisted her in remaining a runaway. *Id.* As a further observation, our court noted "there is no evidence of the defendant's intent to allow [the runaway] to remain away from home against the wishes of her parent . . . . Supplying [the runaway] with alcohol and committing a sex crime upon her does not supply that intent." *Id.* Our court reversed Freemont's conviction for harboring a runaway. *Id.* at \*3.

In *Reese*, the defendant was convicted of harboring a runaway under Iowa Code section 710.8(3). 2016 WL 6270143, at \*1. Reese was the runaway's grandmother. *Id.* On appeal, Reese argued there was insufficient evidence she aided, supported, or sheltered the runaway and of her intent to allow the runaway to remain away from home against the wishes of her guardian. *Id.* The runaway's guardian allowed the child to spend the night at Reese's house, and the child asked to move in with her mother, who lived at Reese's house. *Id.* The guardian initially acceded to the child's request, but was advised the next day to resume custody

and go through the courts to terminate the guardianship. *Id.* The guardian asked for the child's return, but the child's mother refused. *Id.* When the guardian telephoned Reese to seek her assistance, Reese hung up on her. *Id.* Reese continued to ignore the guardian's phone calls for three weeks, eventually disconnecting the phone. *Id.* Reese also suggested to the runaway that they cut their hair and change their names. *Id.* Police officers went to Reese's house four times to find the runaway, and Reese was not forthcoming about the child's whereabouts. *Id.* The runaway recalled on two occasions Reese told her to hide— during the fourth police visit the police located the runaway hiding inside a clothes dryer. *Id.*

Our court distinguished *Reese* from *Freemont*. Unlike the defendant in *Freemont*, Reese provided the runaway with shelter because the house belonged to her—she was purchasing her residence on contract and exercised control over the activities that occurred there. *See Reese*, 2016 WL 6270143, at *2. Reese provided the runaway with care and medicine when the child was sick. *Id.* at *1. And on the element of intent, Reese shunned contact with the guardian and assisted the runaway in evading detection by police. *Id.* at *2. Our court observed "Reese played an independent and active role in giving [the runaway] refuge from the child's legal placement," and our court affirmed the conviction. *Id.*

The present case does not fit neatly within the facts of either *Freemont* or *Reese*. After learning R.C. was a runaway, Rojas allowed R.C. to spend the night. The jury was not presented any evidence regarding the housing arrangement

between Rojas and his father.[10]  R.C. testified she met Rojas's father on February 18, but there is no evidence regarding Rojas's father's response to her presence. Viewing the evidence in the light most favorable to the State, we conclude Rojas was authorized or had apparent authority to allow guests to stay at the house.  It is clear Rojas was residing with his father, and there was no evidence he could not have guests at the residence.  Furthermore, in allowing R.C. to remain at the house after learning she was a runaway, Rojas "harbored" her by providing her shelter.

The evidence of Rojas's specific intent is less clear.  The jury was correctly instructed on the definition of specific intent:

> "Specific intent" means not only being aware of doing an act and doing it voluntarily, but in addition, doing it with a specific purpose in mind.
> Because determining the defendant's specific intent requires you to decide what he was thinking when an act was done, it is seldom capable of direct proof.  Therefore, you should consider the facts and circumstances surrounding the act to determine the defendant's specific intent.  You may, but are not required to, conclude a person intends the natural results of his acts.[11]

Further an actor's specific intent is a mental process that is seldom capable of being shown by direct evidence.  *State v. Walker*, 574 N.W.2d 280, 289 (Iowa 1998).  However, specific intent "may be shown by circumstantial evidence and the reasonable inferences drawn from that evidence." *Id.*  Circumstantial evidence may be considered in determining whether intent can be inferred.  *See State v. Clarke*, 475 N.W.2d 193, 197 (Iowa 1991).  Like direct evidence, circumstantial

---

[10] Throughout his brief, Rojas refers to himself as a "guest" in his father's house.  No evidence was presented to the jury that would support that characterization.
[11] Iowa Crim. Jury Instruction 200.2.

evidence must raise a fair inference of guilt; it must do more than create speculation, suspicion, or conjecture. *Id.*

In *Reese*, the defendant's specific intent was apparent from her active participation in thwarting the guardian's attempts to contact and retrieve the runaway, hiding the child from police, and telling the child they should cut their hair and change their names to escape detection. In *Freemont*, our court noted that providing alcohol to the runaway and commiting a sex crime against her did not provide the requisite intent under section 710.8(3), but that conclusion was coupled with a factual scenario under which the defendant did not provide aid, support, or shelter to the runaway.

Here, Rojas did not actively participate in thwarting the parent's attempts to contact and retrieve R.C. Rojas did not purposely attempt to hide R.C., encourage her to remain a runaway, or prevent her from returning home. Rojas did not interfere with police officers. Rojas did not report the runaway to authorities, but he was under no obligation to do so.

Nonetheless, on Saturday, February 18, 2017, Rojas became informed that R.C. was fifteen years of age, was a runaway, and law enforcement officials were trying to find her. Later that day, he again provided her shelter at his residence and also had sex with R.C. Rojas told Officer Stern he thought R.C. was attempting to leave the state, and he was helping her. The jury was permitted, but not required, to conclude Rojas intended the natural results of his acts—providing R.C. shelter naturally resulted in allowing the runaway child to remain away from home against the wishes of the child's parent. There was sufficient evidence Rojas

intended to allow R.C. to remain away from home against the wishes of her parent.[12]  The court did not err in denying the motion for a directed verdict.

*C. Admission of State's Exhibit 2, the Screenshot.*

Rojas contends the district court abused its discretion in admitting State's Exhibit 2 on the ground the exhibit had not been disclosed until the morning of trial and that it was irrelevant and unfairly prejudicial.

According to the State, the prosecutor did not receive the messages from R.C. until 8:02 p.m. the night before trial.  The messages had apparently been sent at 11:56 a.m. the day before trial.  The State emailed the exhibit to Rojas's attorney at 11:00 p.m. the night before trial.  Because the messages did not exist until the day before trial and State disclosed the exhibit shortly after it was received, the court did not abuse its discretion in excusing the late disclosure.

In the message, Rojas asks R.C. to lie at trial about the fact they had sex. Rojas argues the exhibit is irrelevant because: "Nothing about a text sent in February of 2018 (over year later) has any bearing on the existence of any of [the material facts]."  The State argued the exhibit was relevant because: "It goes to show his intent, his planning, his motive into what he was doing with harboring a runaway."  Rojas's intent is a material fact.  The State's theory is that Rojas had the intent in 2017 for R.C. to remain a runaway so that he could have sex with her. We agree the exhibit has some relevance on that point—if R.C. denied she had

---

[12] The newspaper article observed by R.C. and Rojas on the computer indicated the Madison County Sheriff's Office was seeking help to locate R.C. and that she was last seen in the family residence by family members at approximately 9 p.m. on February 15th.

sex with Rojas, the State's explanation for why Rojas intended R.C. to remain a runaway would be less plausible.

Lastly, Rojas claims the exhibit was prejudicial because "the jury was either misled to believe a sexual encounter constituted an element of the offense, or convicted him without proof, due to their sense of horror, their sympathy, or their believe that he was a bad person and their desire to punish." In ruling on the exhibit's admissibility, the court did not address prejudice. A court *may* exclude relevant evidence if its probative value is substantially outweighed by a danger unfair prejudice. Iowa R. Evid. 5.403.

Here, the alleged prejudice Rojas complains of was already introduced through the testimony of other witnesses, including R.C. Rojas did not object to those witnesses' testimony based on unfair prejudice. Even if the court thought the evidence was prejudicial, exclusion would have been permitted, not required. *See id.* Even assuming the screenshot may have been excluded, the evidence was cumulative. *See State v. Plain*, 898 N.W.2d 801, 813 (Iowa 2017) ("Tainted evidence that is merely cumulative does not affect the jury's finding of guilt."). Because the exhibit was relevant and cumulative, the court did not abuse its discretion in admitting the exhibit.

*D. Proposed Jury Instruction.*

Finally, Rojas contends the district court erred in refusing to give a proposed jury instruction that he did not have an affirmative duty to report the runaway's whereabouts to law enforcement, citing *Freemont*. The State counters the instruction would be duplicative because the "jury knew that failing to report a runaway was not an element of the crime."

We observe, as the *Freemont* court did, that Iowa Code section 710.8 contains no requirement a person report a runaway's whereabouts to law enforcement. We conclude the court abused its discretion by failing to give the requested instruction because it correctly stated the law, had application to the case, and was not stated elsewhere in the instructions. *See Plain*, 898 N.W.2d at 817; *Kellogg*, 542 N.W.2d at 516. However, in *Plain*, the court noted that even where a court abuses its discretion in failing to give a proper instruction, reversal is not required:

> "Error in giving or refusing to give a jury instruction does not warrant reversal unless it results in prejudice to the complaining party." "When the error is not of constitutional magnitude, the test of prejudice is whether it sufficiently appears that the rights of the complaining party have been injuriously affected or that the party has suffered a miscarriage of justice." "We [do] not reverse for marginal or technical omissions . . . ."

898 N.W.2d at 817 (alteration in original) (citations omitted).

Rojas's proposed instruction is not of constitutional magnitude, and we do not find he was prejudiced by the court's refusal to give the instruction. *See id.* We are unable to conclude Rojas was injuriously affected or suffered a miscarriage of justice upon Rojas's speculation that the jury decided the case upon an improper basis. Here, the instructions are not confusing, and the court did not materially misstate the law. Nothing in the record suggests the jury was misled or confused. We determine Rojas was not prejudiced by the court's refusal to give his proposed jury instruction. We affirm the conviction.

**AFFIRMED.**